Judith S. FEDER, Plaintiff,

v.

MARTIN MARIETTA CORPORATION and Sperry Rand Corporation, Defendants.

No. 63 Civ. 2753.

United States District Court
S. D. New York.

Jan. 24, 1968.

Sidney B. Silverman, New York City, for plaintiff.

DeBevoise, Plimpton, Lyons & Gates, New York City, for defendant Martin Marietta Corporation; Samuel E. Gates, Cecil Wray, Jr., New York City, of counsel.

Chadbourne, Parke, Whiteside & Wolff, New York City, for defendant Sperry Rand Corporation; Charles Pickett, Edward C. McLean, Jr., New York City, of counsel.

## OPINION

COOPER, District Judge.

This action is based upon § 16(b) of the Securities Exchange Act, 15 U.S.C. § 78p(b).[1] Plaintiff,[2] a shareholder of de-

---

1. § 16(b) of the Securities Exchange Act provides:

    For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) within any period of less than six months, unless such security was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months. Suit to recover such profit may be instituted at law or in equity in any court of competent jurisdiction by the issuer, or by the owner of any security of the issuer in the name and in behalf of the issuer if the issuer shall fail or refuse to bring such suit within sixty days after request or shall fail diligently to prosecute the same thereafter; but no such suit shall be brought more than two years after the date such profit was realized. This subsection shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale, or the sale and purchase, of the security involved, or any transaction or transactions which the Commission by rules and regulations may exempt as not comprehended within the purpose of this subsection.

2. Suit may be instituted under § 16(b) "by the owner of any security of the issuer in the name and in behalf of the issuer." The caption of this action does not recite that plaintiff is suing "in the name and in behalf" of Sperry Rand Corporation. Such inaccuracy, however, is remedied by the complaint wherein plaintiff asserts that the action is brought "on behalf of herself and all other security holders of Sperry Rand Corporation ('Sperry') similarly situated, and Sperry * * *."

fendant Sperry Rand Corporation[3] (hereinafter Sperry) seeks recovery, on behalf of Sperry, of profits realized by defendant Martin Marietta Corporation (hereinafter Martin) from alleged purchases and sales of Sperry common stock within a period of less than six months. Sperry's common stock was, at all relevant times, registered on the New York Stock Exchange, and is not now, nor has it ever been, an "exempted security" within the meaning of § 3(a) (12) of the Securities Exchange Act, 15 U.S.C. § 78c(a) (12).

Pursuant to § 16(b), plaintiff requested that Sperry institute suit against Martin to recover the profits realized from the alleged transactions. Plaintiff's request was refused in a letter from Sperry's general counsel to plaintiff's attorney (Ex. 8).[4]

Martin commenced purchasing Sperry common stock on December 14, 1962 and continued such purchases throughout the period up to and including July 24, 1963; during that time, Martin accumulated 801,300 shares of stock. On March 27, 1963, Sperry's Board of Directors resolved that George M. Bunker, Martin's president and chief executive officer, be invited to membership on the Board to fill the vacancy created by the resignation of Harry Landsiedel. Bunker informed Martin's Board of Directors, at its April 25th meeting, of Sperry's invitation, and asked their permission to serve; it was the consensus of the Board that he accept the invitation. On April 29, 1963, Bunker was elected a director of Sperry, and he retained such directorship until he tendered his resignation on August 1, 1963, effective as of that date. During the period commencing August 29, 1963 and terminating

September 6, 1963, Martin sold all Sperry shares held by it.

Plaintiff stipulated that she makes no claim with respect to such purchases by Martin prior to March 1, 1963; purchases between March 1, 1963 and July 24, 1963 total 229,300 shares.

## EVIDENTIARY RULINGS

■ Plaintiff has asked this Court to reconsider its rulings denying admissibility of two exhibits. Exhibit 1 for identification is an anonymous memorandum, taken from Martin's files, entitled "NOTES ON EXPLORATORY INVESTMENT IN SPERRY RAND CORPORATION." Plaintiff offers this exhibit for the express purpose of showing that "Martin had confidential information about Sperry's affairs,"[5] and for the ultimate purpose of impeaching Bunker's testimony that he did not disclose inside information about Sperry to his associates at Martin.[6] Upon reconsideration, we find this exhibit admissible. There is sufficient circumstantial proof to establish its authenticity as a document prepared by a person in Martin's employ; defendant Martin has stipulated that the exhibit was furnished from its files. See United States v. Imperial Chemical Industries, 100 F.Supp. 504, 513 (S.D.N.Y.1951). Accordingly, we admit Exhibit 1 into evidence.[7] The weight to be accorded it is another matter.

We disagree with plaintiff's assertion, for we do not find the information contained in this memorandum necessarily "confidential;" portions of the memorandum contain information readily available to the investing public, while other portions contain statements which may be nothing more than one man's opinion. Additionally, the evidence con-

---

3. The parties have stipulated that plaintiff is the beneficial owner of 100 shares of Sperry common stock.

4. "Ex." followed by a number refers to an exhibit in evidence.
   "Tr." followed by a number refers to pages of the transcript of trial proceedings.

5. Plaintiff's Post-Trial Memorandum, p. 51.

6. Tr. 122–24.

7. Defendant Martin's motion to strike those portions of Bunker's direct examination having reference to Exhibit 1 is denied.

tradicts plaintiff's contention that such information could only be obtained from a corporate insider, namely, Bunker. Therefore, we give little weight to Exhibit 1.

Exhibit 4 for identification is a magazine article entitled "The Millions Under Martin Marietta's Mattress," which appeared in the November, 1963 edition of *Fortune*. Plaintiff, while admitting the exhibit is hearsay, contends that "one statement" appearing therein constitutes an admission by Bunker, and is therefore admissible as an exception to the hearsay rule.[8] The article's author, Charles J. V. Murphy, interviewed Bunker on two occasions; during these interviews, Murphy had a stenographer present to take notes. The statement which presently concerns us is set off by quotation marks ostensibly to indicate that the words used originated with Bunker.

■ Bunker testified that he did not recall making the statement here in question, although he did recall reading the article "at the time it was published." Plaintiff concedes that "the fact that the statement is attributed to Bunker in a magazine article is insufficient."[9] Plaintiff contends, however, that Bunker, after reading the article, never informed the author or an officer or employee of *Fortune* magazine that he did not make the statement attributed to him; therefore his silence constitutes an admission that he did make it. While the evidence supports the contention that Bunker never denied making the statement, we find unacceptable the conclusion plaintiff would have us draw. Accordingly, we sustain the objection to Exhibit 4 for identification.

## § 16(b)

The preamble of § 16(b) sets forth the congressional intent underlying its enactment: "For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner,[10] director, or officer by reason of his relationship to the issuer * * *." To effectuate such purpose, the imposition of liability is based upon an objective measure of proof,[11] i.e., regardless of whether or not inside information was actually used. On the other hand, despite proof of the unfair use of such information, liability is imposed only on "insiders," i.e., 10% stockholders, officers, and directors, as those terms are defined in the statute and in the rules and regulations of the Securities and Exchange Commission.

Martin's realization of a profit from its purchases and sales of Sperry common stock, within a period of less than six months, is clearly evident. There remains for determination the issue of whether Martin was an "insider." This issue is narrowed by our finding that Martin was neither a 10% stockholder nor an officer of Sperry. We must determine whether Martin was a director of Sperry during the period here relevant.

■ Section 3(a) (9) of the Securities Exchange Act, 15 U.S.C. § 78c(a) (9), provides that "the term 'person' means * * * a corporation * * *," and § 3(a) (7), 15 U.S.C. § 78c(a) (7), that " 'director' means any director of a corporation or any person performing similar functions with respect to any organization, whether incorporated or unincorporated." Thus, although not expressly designated as such, for purposes of § 16 a corporation could be a

8. Plaintiff's Post-Trial Memorandum, p. 53.

9. Id.

10. "Every person who is directly or indirectly the beneficial owner of more than 10 per centum of any class of any

equity security * * * which is registered on a national securities exchange * * *" 15 U.S.C. § 78p(a).

11. Smolowe v. Delendo Corp., 136 F.2d 231, 235, 148 A.L.R. 300 (2d Cir.), cert. denied, 320 U.S. 751, 64 S.Ct. 56, 88 L.Ed. 446 (1943).

"director" and function through a deputy of its choosing. See Marquette Cement Mfg. Co. v. Andreas, 239 F.Supp. 962 (S.D.N.Y.1965); cf. Blau v. Lehman, 368 U.S. 403, 82 S.Ct. 451, 7 L.Ed. 2d 403 (1962).

That a corporation could be a director leads to the inquiry of the standard to be applied in determining such status. The Supreme Court's dictum in *Blau*, that "Lehman Brothers [a partnership] would be a 'director' of Tide Water, if * * * Lehman actually functioned as a director through Thomas, who had been deputized by Lehman to perform a director's duties not for himself but for Lehman," [12] is likewise applicable when it is a corporation which is sought to be brought within § 16(b)'s definition of "director."

## DEPUTIZATION

▮ Plaintiff has the burden of convincing this Court that Martin deputized Bunker to represent its interests as a director on Sperry's Board.[13] While liability fixed by § 16(b) is imposed on directors according to an objective standard of proof, resort must be had to a subjective standard [14] to determine whether a corporation is a "director." The existence of deputization is a "question of fact to be settled case by case;" [15] the realization that, in many instances, the evidence necessary for such a showing is within the knowledge and control of the defendant corporation does not alleviate plaintiff's burden. In the absence of proof of formal deputization by the corporation, plaintiff must rely on circumstantial evidence and the inferences to be drawn therefrom.

12. 368 U.S. at 410, 82 S.Ct. at 455. The theory of deputization had its origin in Judge Learned Hand's concurring opinion in Rattner v. Lehman, 193 F.2d 564, 566 (2d Cir. 1952). There, Judge Hand, while agreeing with the majority that § 16(b) does not go so far as to hold partners liable for whatever profits their firm realizes "whenever one of their members is a director, and only because he is a director," stated that he wished "to say nothing as to whether, if a firm deputed a partner to represent its interests as a director on the board, the other partners would not be liable." Id. at 566–567.

In Blau v. Lehman, 286 F.2d 786 (2d Cir. 1960), the Court of Appeals noted its disagreement with Judge Hand's dictum: "We do not see how any sort of deputizing can make the partners or the partnership a 'director' within the meaning of section 16(b)." Id. at 789. However, there being "no evidence of any deputizing or other affirmative action by the firm to cause Thomas to be made a director to protect the interests of the firm or to become its representative," the Court found that it need not decide the question of whether deputization would bring the firm within the 16(b) meaning of "director." The Supreme Court, in the course of its affirmance, 368 U.S. 403, 82 S.Ct. 451 (1962), resolved the issue of whether, by use of the deputization theory, a partnership could be considered a director, stating that Lehman would be a "director" if it "actually functioned as a director through Thomas," who it had deputized to perform a director's duties for it. Id. at 410, 82 S.Ct. at 455. The Supreme Court's language appears to narrow the deputization theory as first announced by Judge Hand in *Rattner*. Deputized "to represent its interests" is a broader concept than "deputized * * * to perform a director's duties" for it; the latter being one way in which a deputy could represent a firm's interests. This may be justified as a result of the literal construction of the "director" definition, 15 U.S.C. § 78c(a) (7). The Supreme Court did not fully discuss this issue and therefore the weight to be accorded its dictum is unclear. See The Supreme Court, 1961 Term, 76 Harv.L.Rev. 214, 217 (1962).

13. Having already noted that "deputized to represent interest" is a broader concept than "deputized * * * to perform a director's duties," supra note 12, we apply the broader of the two for if plaintiff fails to satisfy us that Martin deputized Bunker to represent its interests on Sperry's Board, she necessarily fails in her proof of deputization to perform a director's duties.

14. The standard of proof is subjective in the sense that the issue is a factual one to be determined on a case by case basis, unlike liability which is imposed automatically once the requirements of § 16 (b) have been satisfied.

15. Marquette Cement Mfg. Co. v. Andreas, 239 F.Supp. 962, 967 (S.D.N.Y.1965).

## (a) Sperry's invitation

In the spring of 1962, Norman B. Frost, a Sperry director and its general counsel at all times here relevant, and Harry F. Vickers, president, chief executive officer and director of Sperry, had a series of talks concerning possible new directors in anticipation of three vacancies on Sperry's nine man Board. At Vickers' request, Frost submitted a list of names of men he believed would be good directors; included was Martin's president and chief executive officer, George M. Bunker. In late September or early October, 1962, Frost inquired of Bunker whether he would so serve if invited. Bunker replied that he had large responsibilities and did not think he would have the time. We have it then that Sperry first expressed this interest in Bunker about two and a half months prior to December 14, 1962, the date on which Martin commenced purchasing Sperry stock.

On February 1, 1963, Harry Landsiedel resigned his Sperry directorship.[16] Later that month, Frost against approached Bunker about joining Sperry's Board. Bunker again replied that he was too busy, but he "left the gate open," so that Frost felt "free to go back and ask him again."[17]

By February 1, 1963, Martin owned well over 400,000 shares of Sperry common stock, and its ownership increased substantially during that month. We note, however, Bunker's apparent reluctance to become a Sperry director when approached in February.

Sperry's Board of Directors, on March 27, 1963, duly adopted the following resolution: "RESOLVED, that Mr. George M. Bunker be invited to membership on this Board of Directors to fill the vacancy thereon." Around the middle of April, Frost informed Bunker of the Board's resolution and indicated that a formal invitation would be extended by Vickers;[18] Frost urged Bunker to agree to become a director. Whereupon Bunker informed Frost that Martin owned in excess of 700,000 shares of Sperry stock, and indicated that he would give the matter consideration and let Frost know. During the next few days, Bunker spoke with Vickers, and received a number of telephone calls from other Sperry people who expressed the hope that he would accept the invitation. The parties have stipulated that on or about April 22, 1963, Bunker accepted Sperry's invitation. He was elected a director on April 29, 1963.

Frost's interest in Bunker as a prospective director was based primarily on the latter's "business reputation," "his reputation in financial circles," and Frost's "personal knowledge of him over many years." Prior to his February conversation with Bunker, Frost had heard a rumor that Martin was accumulating Sperry stock. Such rumor "didn't basically change" Frost's view, although he "probably felt more than ever that Mr. Bunker was a desirable man." Frost was apprehensive of a "raid" on Sperry and believed Bunker's presence would add strength to the Board, and perhaps cause prospective "raiders" to abandon their plans.

We find that while Martin's substantial stock ownership was a factor underlying Sperry's invitation to Bunk-

---

16. His resignation was accepted by Sperry's Board of Directors on February 27, 1963.

17. During cross-examination, Frost elaborated further: "In my conversation with him in February, his attitude was just about the same as it was in the autumn of 1962. 'I'm busy. I like your company. I would like to serve, but I have other responsibilities.' My feeling was that he—on both occasions that he left the door open for me at some future date to broach it again, but his statements were that he was busy; he took his responsibilities as a director, whereever he was a director, very seriously and that he didn't think he had the time" (Tr. 262–63).

18. Sperry protocol dictated that the invitation be extended by the chief executive officer.

er, it was not the controlling factor.[19] As previously noted, Sperry's determined interest in Bunker was expressed prior to Martin's acquisition of stock. Additionally, we attach significance to the fact that at no time did either Bunker or Frost ever suggest that, if Bunker declined to serve, another person associated with Martin be made a Sperry director.

Plaintiff contends that Frost's letter of September 17, 1963 (Ex. 8), wherein Sperry refused plaintiff's request that it institute suit against Martin, shows that Sperry invited Bunker because of Martin's stock ownership. We find little merit in this contention. The pertinent statement appearing in that letter reads: "After the corporation learned that Martin Marietta had acquired nearly one million shares of its stock, Mr. Bunker was invited to become a member of the Sperry Rand Board." When read in context with the rest of the letter, it becomes evident that this statement was inserted merely to indicate the sequence of events, and not to express the reason underlying Sperry's invitation to Bunker.

Both lower courts in Blau v. Lehman [20] placed considerable weight on the fact that the invitation to join the Board was upon the initiative of Tide Water and not the defendant partnership. Similarly, here Sperry took the initiative. While such a showing does not preclude a finding of deputization, it is a factor to be considered along with the rest of the evidence bearing on this issue.

(b) *Bunker's reasons for accepting*

We find Bunker's testimony credible.

His acceptance of Sperry's invitation appears to have been motivated both by his own personal interests and his belief that some benefit would inure to Martin from such an association. Bunker considered Sperry to be "a company of very interesting and very complex and unusual management problems;" a directorship on Sperry's Board offered a "very challenging situation." Furthermore, Martin had an "underlying interest in the computer business;" exposure to some of the operational problems that Sperry, specifically its Univac Division, was experiencing would increase Bunker's knowledge of the computer field and inure to the benefit of Martin. '

Bunker's uncontradicted testimony dispelled any notion that his acceptance was a result of Martin's ownership of Sperry stock.[21]

(c) *Martin's Board meeting*

On April 25, 1963, Bunker informed Martin's Board of Directors that Martin had purchased 700,000 shares of Sperry common stock,[22] and that he had been invited to join Sperry's Board and would like their permission to do so. Martin's officers were required to get the Board's permission to serve on other corporations because of the time element, but the Board was "reasonably permissive" in granting such requests. On this occasion, "It was the consensus of the

---

**19.** Sperry, by Frost, answered as follows to interrogatories served on it:

Question "4. State whether Mr. Bunker was invited to serve on Sperry's board of directors to give representation to Martin-Marietta Corporation's interest in Sperry."

Answer: "A qualified no, as explained in Paragraph 3, supra."

Answer to paragraph 3:

"The press reports to the effect that Martin-Marietta Corporation had acquired a large number of shares of Sperry's common stock were a fact considered but not the controlling factor. Sperry had been looking for an able businessman to fill a vacant directorship, and Mr. Bunker seemed to fill the bill" (Tr. 274–75).

After stating, "where I said, 'The press reports,' I should have said, 'The rumors,'" Frost adopted the answers as his trial testimony (Tr. 275).

**20.** 173 F.Supp. 590 (S.D.N.Y.1959), aff'd, 286 F.2d 786 (2d Cir. 1960).

**21.** Tr. 199–200.

**22.** The fact that Martin was purchasing Sperry stock was not discussed at any Board meeting prior to this one.

Board that the action previously taken was for the benefit of the corporation and that Mr. Bunker accept the invitation" (Excerpts from minutes of Board of Directors Meeting, Ex. 5).

During the meeting, nothing was said or took place to give Bunker the impression that any member of the Board believed the invitation was to represent Martin's interest;[23] Bunker did testify, however, that he thought the Board would draw the inference that his presence on Sperry's Board would be to Martin's interest. The logic behind such an inference is obvious when we stop to consider that a directorship, by its very nature, carries with it potential access to information unavailable to the ordinary investor.[24] However, the mere fact that the Board may have recognized the obvious is certainly not proof of deputization. There is no evidence of any affirmative action by Martin to cause Bunker to be made a Sperry director; nor will the Board's conduct support even an inference that it deputized him to represent its interests on Sperry's Board.

#### (d) *Bunker's approval of stock purchases*

Prior to, during, and after the period of his directorship, Bunker possessed the power of ultimate approval over purchases and sales of Sperry stock. Although the decisions to purchase and sell originated with Muckley, Martin's financial vice president,[25] Bunker could veto such course of action; if Bunker withheld his approval, Martin would not have purchased additional shares, nor would it have sold the shares it held.

During the period of Bunker's directorship, Martin purchased 101,300 shares of Sperry stock.[26] While Bunker did not approve each additional purchase of stock, he did give his approval to a general plan of purchase.[27] Plaintiff asserts that Bunker "caused"[28] Martin to purchase these additional shares. We agree with Sperry's observation that "the word 'caused' overemphasizes Bunker's role."[29] That is not to say, however, that we do not recognize the highly advantageous position occupied by Bunker; any inside information he obtained as a director could readily affect his decision to continue his approval of additional purchases.[30]

#### (e) *Disclosure of inside information*

The mere disclosure of inside information will not subject the recipient, who makes use of it, to the sanctions of § 16(b), but proof of such dis-

---

23. Bunker also testified that there was not any discussion as to whether or not he should sit on Sperry's Board (Tr. 174).

24. Additionally, we have already noted that Bunker's closer association with Sperry would increase his knowledge of the computer business and in that way be of some benefit to Martin.

25. Martin's Corporate Planning Department, under the supervision of Murray Sanders, engaged in the study of various corporations; Sanders reported to Muckley.

26. All sales of Sperry stock occurred after Bunker resigned his directorship.

27. Apparently the consent of Martin's Board of Directors was not needed; Martin purchased up to 700,000 shares before even informing its Board of that fact.

28. The Court of Appeals in both *Rattner* and *Blau,* supra note 12, left open the question whether their results might have been different had the director-partner "caused" the firm to enter the "short swing" transactions. That issue, however, had only to do with the director-partner's individual liability and not the liability of the partnership. In the present case, plaintiff has not brought suit, on behalf of Sperry, against Bunker.

29. Sperry's Post-Trial Memorandum, p. 41.

30. Contrast Blau v. Lehman, 173 F.Supp. 590 (S.D.N.Y.1959), where the court found as a fact "that the stock of Tide Water was bought and sold by Lehman without any advice or concurrence of Thomas, or without his knowledge until after the transactions had taken place." Id. at 592.

closure is a factor to be considered on the issue of deputization.[31]

Bunker testified that he participated in sessions when Martin's investment in Sperry was reviewed, and that he discussed Sperry's affairs with Mr. Muckley and Mr. Miles, Martin's general counsel. Bunker also testified, however, that the information he received at Sperry Board meetings was not made available to Martin's officers or directors. Further, he stated that he did not receive "information that would affect an investment in any regard;" rather, most of the information he obtained while a director had to do with Sperry's "operational situation." Bunker also spoke with other Martin people, such as William Berger, president of Martin's Aerospace Division, about trips he took to Sperry's manufacturing plants. These discussions involved technical matters, manufacturing and production problems, as opposed to policy or investment matters.

██ In effect Bunker asserts that he never disclosed inside information relevant to investment decisions, and he supports that assertion with yet another,

namely, that the information that he obtained while a director "simply wasn't germane to that question at all." We credit Bunker's uncontradicted testimony on this point, and find that while a Sperry director he did not disclose such inside information.[32]

Plaintiff contends that Bunker's willingness to make inside information available to Martin, even if no disclosure was in fact made, "shows that Bunker was acting as Martin's deputy." [33] We disagree with both plaintiff's legal and factual conclusion; there is support for neither. While a showing that Bunker was willing to disclose inside information would be some evidence of deputization, it is not conclusive on that score.

### (f) Bunker's letter of resignation

On August 1, 1963, Bunker, in a letter addressed to General Douglas MacArthur, Chairman of the Board of Sperry, tendered his resignation as a member of Sperry's Board of Directors, effective as of that date.[34] In his testimony, Bunker assigned as the reason for his resignation "the amount of time and energy it seemed to be running into."

31. Defendant Martin asserts that "neither the use nor the availability of 'inside information' is relevant in determining liability under 16(b);" we agree. However, evidence of such use is relevant in determining whether Martin was a "director." Accordingly, we deny defendant Martin's motion to strike those portions of the testimony dealing with the use and availability of inside information. (Defendant Martin's Reply Memorandum, pp. 8–9.)

32. We note, however, that Bunker's power of ultimate approval placed him in a position where he could make use of inside information on Martin's behalf without the need of actually disclosing it. Bunker's testimony to the effect that he obtained no information useful in making investment decisions was partially corroborated by Frost in his letter of September 17, 1963: "There was no circumstance or happening in any way related to the value or market price of the shares that came to the knowledge of Mr. Bunker or Martin Marietta during

the period he served as a Director" (Ex. 8).

33. Plaintiff's Reply Memorandum to Sperry's Brief, p. 4.

34. My dear General MacArthur:
I tender you herewith my resignation as a member of the Board of Directors of Sperry Rand Corporation, effective as of this date.
When I became a member of the Board in April, it appeared to your associates that the Martin Marietta ownership of a substantial number of shares of Sperry Rand should have representation on your Board. This representation does not seem to me really necessary, and I prefer not to be involved personally in the affairs of Sperry Rand when there are so many other demands on my time.
I shall continue to watch developments with great interest on behalf of Martin Marietta as a shareholder.
Sincerely yours,
/s/
George M. Bunker
(Ex. 3)

Plaintiff looks to this letter in support of her contention that "Sperry's Board believed Bunker to be Martin's representative." [35] The language of the letter, specifically, "When I became a member of the Board in April, it appeared to your associates [36] that the Martin Marietta ownership of a substantial number of shares of Sperry Rand should have representation on your Board," is without ambiguity. Frost testified, however, that he did not consider Bunker to be Martin's representative. Bunker, himself, testified that while on the Board, with the one exception of General MacArthur, no Sperry director ever suggested that he was sitting to represent Martin. Additionally, at the time of Bunker's resignation or later neither Frost nor any one else suggested that some other person connected with Martin be made a director to fill the vacancy.

Plaintiff also asserts that the last sentence of the letter [37] shows that "Bunker considered himself to be Martin's representative." [38] Bunker testified that he did not consider that he was sitting on Sperry's Board as the representative of Martin; we do not read into the letter's last sentence any contradictory meaning.

### (g) *Martin's representatives on other boards*

Martin has placed representatives on the boards of other corporations. Such designation of directors occurred on the boards of Martin's wholly owned subsidiaries and in corporations in which Martin held "a sizable portion of the total ownership." When so designating a man, Martin expects "some association between the two companies," and it takes an "active part in the management" of those companies; its representatives are told, from time to time, what positions to take on various matters, and they report back to Martin what is going on in the companies on whose boards they sit.

Bunker, on the other hand, never reported what went on at Sperry to Martin's Board; nor was he instructed to take a certain position on any Sperry matter.

Plaintiff contends that Bunker's testimony establishes that "Martin's deputies report back to Bunker, not to the board," and therefore "when Bunker is the representative, there is manifestly no need for reporting back." [39] The testimony relied upon follows:

"Q  Well, now, do you tell those representatives what positions they should take on various matters?

A  From time to time, yes.

Q  And how they should vote?

A  It doesn't usually quite come to that.

Q  All right.  Do they report back to you?

A  Yes.

Q  As to what is going on in those companies in which you have substantal interest?

A  Yes."  (Tr. 148)

The word "you" appearing in the questions is quite ambiguous; in the light of his entire testimony, we conclude that "you" had reference to Martin and not to Bunker personally.  The last question, reproduced above, supports this conclusion; there "you" clearly referred to Martin.  Later testimony adds further clarity:

"Q  All right.  Did the directors report to Martin-Marietta—that is, did the directors of those companies report to Martin-Marietta with respect to the activities of those companies?

A  Yes.  Yes.

35.  Plaintiff's Post-Trial Memorandum, p. 16.

36.  Bunker testified that "your associates" referred to Sperry "directors or officers."

37.  Supra note 34.

38.  Plaintiff's Post-Trial Memorandum, p. 17.

39.  Id. at 32–33.

"Q From time to time, did Martin-Marietta give those employees of Martin-Marietta who sat as directors of these wholly-owned subsidiaries, instructions?

A Yes." (Tr. 153)

### (h) Bunker's power

Bunker was president, chief executive officer, director, and stockholder of Martin. His duties "encompassed a whole gamut of the corporate activities;" as chief executive officer he was "ultimately responsible for the total operation of the corporation." His power of ultimate approval over the purchases and sales of Sperry stock has already been noted.

Plaintiff contends that "if Bunker had sufficient power to buy and sell millions of dollars of stock owned by Martin, he certainly possessed the power to designate himself Martin's representative on the Sperry board." [40] We disagree. There is no proof that it was within the realm of Bunker's responsibilities to designate representatives to sit on boards of other corporations. In any event, even if we were convinced that he possessed the power attributed to him, there is insufficient evidence upon which to base even an inference that Bunker designated himself to sit on Sperry's Board as Martin's representative.

### CONCLUSION

After a thorough examination of the testimony, exhibits, and competent memoranda submitted by counsel for each party, we find that the evidence fails to establish that Martin deputized Bunker to represent its interests as a director on Sperry's Board; a fortiori, there is no evidence that Martin deputized Bunker to perform a director's duties for it. Plaintiff has not met her burden of proof.

This disposition obviates the need to discuss defendant Martin's defense that, assuming it was a "director," liability cannot be imposed because the directorship terminated before any sales of stock were made.

Motion to dismiss the action against Martin Marietta Corporation is granted.

The action is dismissed against Sperry Rand Corporation.

Judgment for defendant Martin Marietta Corporation.

The foregoing shall constitute this Court's Findings of Fact and Conclusions of Law as required by Rule 52, F.R.Civ.P.

So ordered.

---

40. Plaintiff's Reply Memorandum, p. 4.