Judith S. **FEDER**, Plaintiff-Appellant,

v.

**MARTIN MARIETTA CORPORATION**
and Sperry Rand Corporation,
Defendants-Appellees.

No. 33, Docket 32159.

United States Court of Appeals
Second Circuit.

Argued Sept. 19, 1968.

Decided Jan. 14, 1969.

---

Sidney B. Silverman, Mordecai Rosenfeld, New York City, for plaintiff-appellant.

Cecil Wray, Jr., Samuel E. Gates, Debevoise, Plimpton, Lyons & Gates, New York City, for appellee Martin Marietta Corp.

Charles Pickett, Edward C. McLean, Jr., Chadbourne, Parke, Whiteside & Wolfe, New York City, for appellee Sperry Rand Corp.

Before WATERMAN, SMITH and HAYS, Circuit Judges.

WATERMAN, Circuit Judge:

Plaintiff-appellant, a stockholder of the Sperry Rand Corporation ("Sperry") after having made the requisite demand

upon Sperry which was not complied with, commenced this action pursuant to § 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b) (1964), to recover for Sperry "short-swing" profits realized upon Sperry stock purchases and sales by the Martin Marietta Corporation ("Martin").[1] Plaintiff alleged that George M. Bunker, the President and Chief Executive of Martin Marietta, was deputized by, or represented, Martin Marietta when he served as a member of the Sperry Rand Board of Directors and therefore during his membership Martin Marietta was a "director" of Sperry Rand within the meaning of Section 16 (b). The United States District Court for the Southern District of New York, Cooper, J., sitting without a jury, finding no deputization, dismissed plaintiff's action. 286 F.Supp. 937 (SDNY 1968). We hold to the contrary and reverse the judgment below.

█ █ The purpose of § 16(b) as succinctly expressed in the statute itself is to prevent "unfair use of information" by insiders and thereby to protect the public and outside stockholders. The only remedy which the framers of § 16 (b) deemed effective to curb insider abuse of advance information was the imposition of a liability based upon an objective measure of proof, e. g., Smolowe v. Delendo Corp., 136 F.2d 231, 235 (2 Cir.), cert. denied, 320 U.S. 751, 64 S.Ct. 56, 88 L.Ed. 446 (1943). Thus, application of the act is not conditional upon proof of an insider's intent to profit from unfair use of information, e. g., Blau v. Lamb, 363 F.2d 507, 515 (2 Cir. 1966), cert. denied, 385 U.S. 1002, 87 S.Ct. 707, 17 L.Ed.2d 542 (1967), or upon proof that the insider was privy to any confidential information, e. g., Ferraiolo v. Newman, 259 F.2d 342, 344 (6 Cir. 1958), cert. denied, 359 U.S. 927, 79 S.Ct. 606, 3 L.Ed.2d 629 (1959). Rather, Section 16(b) liability is automatic, and liability attaches to any profit by an insider on any short-swing transaction embraced within the arbitrarily fixed time limits of the statute.

█ The judicial tendency, especially in this circuit, has been to interpret Section 16(b) in ways that are most consistent with the legislative purpose, even departing where necessary from the literal statutory language. See, e. g., cases cited in Blau v. Oppenheim, 250 F.Supp. 881, 884–885 (SDNY 1966) (Weinfeld, J.). But the policy underlying the enactment of § 16(b) does not permit an expansion of the statute's scope to persons other than directors, officers, and 10% shareholders. Blau v. Lehman, 368 U.S. 403, 410–411, 82 S.Ct. 451, 7 L.Ed.2d 403 (1962). Cf. Ellerin v. Massachusetts Mut. Life Ins. Co., 270 F.2d 259, 263 (2 Cir. 1959). Through the creation of a legal fiction,

1. Section 16(b) provides:

(b) For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) within any period of less than six months, unless such security was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months. Suit to recover such profit may be instituted at law or in equity in any court of competent jurisdiction by the issuer, or by the owner of any security of the issuer in the name and in behalf of the issuer if the issuer shall fail or refuse to bring such suit within sixty days after request or shall fail diligently to prosecute the same thereafter; but no such suit shall be brought more than two years after the date such profit was realized. This subsection shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale, or the sale and purchase, of the security involved, or any transaction or transactions which the Commission by rules and regulations may exempt as not comprehended within the purpose of this subsection.

however, our courts have managed to remain within the limits of § 16(b)'s literal language and yet have expanded the Act's reach.

In Rattner v. Lehman, 193 F.2d 564 (2 Cir. 1952), Judge Learned Hand in his concurring opinion planted the seed for a utilization of the theory of deputization upon which plaintiff here proceeds. In discussing the question whether a partnership is subject to Section 16(b) liability whenever a partner is a director of a corporation whose stock the partnership traded, Judge Hand stated:

> I agree that § 16(b) does not go so far; but I wish to say nothing as to whether, if a firm deputed a partner to represent its interests as a director on the board, the other partners would not be liable. True, they would not even then be formally "directors"; but I am not prepared to say that they could not be so considered; for some purposes the common law does treat a firm as a jural person. 193 F.2d at 567.

The Supreme Court in Blau v. Lehman, 368 U.S. 403, 408–410, 82 S.Ct. 451, 7 L.Ed.2d 403 (1962), affirming 286 F.2d 786 (2 Cir. 1960), affirming 173 F.Supp. 590 (SDNY 1959) more firmly established the possibility of an entity, such as a partnership or a corporation, incurring Section 16(b) liability as a "director" through the deputization theory. Though the Court refused to reverse the lower court decisions that had held no deputization, it stated:

> Although admittedly not "literally designated" as one, it is contended that Lehman is a director. No doubt Lehman Brothers, though a partnership, could for purposes of § 16 be a "director" of Tide Water and function through a deputy * * *. 368 U.S. at 409, 82 S.Ct. at 455.

In Marquette Cement Mfg. Co. v. Andreas, 239 F.Supp. 962, 967 (SDNY 1965), relying upon Blau v. Lehman, the availability of the deputization theory to impose § 16(b) liability was again recognized. See also Molybdenum Corp. of America v. International Mining Corp., 32 F.R.D. 415, 418 (SDNY 1963).

█ In light of the above authorities, the validity of the deputization theory, presumed to be valid here by the parties and by the district court, is unquestionable. Nevertheless, the situations encompassed by its application are not as clear. The Supreme Court in Blau v. Lehman intimated that the issue of deputization is a question of fact to be settled case by case and not a conclusion of law. See 368 U.S. at 408–409, 82 S.Ct. 451. Therefore, it is not enough for appellant to show us that inferences to support appellant's contentions should have been drawn from the evidence. Id. at 409, 82 S.Ct. 451. Rather our review of the facts and inferences found by the court below is imprisoned by the "unless clearly erroneous" standard. Fed.R.Civ. P. 52(a). In the instant case, applying that standard, though there is some evidence in the record to support the trial court's finding of no deputization, we, upon considering the entire evidence, are left with the definite and firm conviction that a mistake was committed. Guzman v. Pichirilo, 369 U.S. 698, 702, 82 S.Ct. 1095, 8 L.Ed.2d 205 (1962); United States v. United States Gypsum Co., 333 U.S. 364, 394–395, 68 S.Ct. 525, 92 L.Ed. 746 (1948). Consequently, we reverse the result reached below.

Bunker served as a director of Sperry from April 29, 1963 to August 1, 1963, when he resigned. During the period December 14, 1962 through July 24, 1963, Martin Marietta accumulated 801,-300 shares of Sperry stock of which 101,300 shares were purchased during Bunker's directorship. Between August 29, 1963 and September 6, 1963, Martin Marietta sold all of its Sperry stock. Plaintiff seeks to reach, on behalf of the Sperry Rand Corporation, the profits made by Martin Marietta from the 101,300 shares of stock acquired between April 29 and August 1, all of which, of course, were sold within six months after purchase.

The district court, in determining that Bunker was not a Martin deputy, made the following findings of fact to support its decision: (1) Sperry initially invited Bunker to join its Board two and a half months before Martin began its accumulation of Sperry stock; (2) Bunker turned down a second offer by Sperry at a time when Martin already held 400,000 shares of Sperry stock; (3) Sperry, not Martin, took the initiative to encourage Bunker to accept the directorship; (4) no other Martin man was ever mentioned for the position in the event Bunker absolutely declined; and (5) Bunker's fine reputation and engineering expertise was the prime motivation for Sperry's interest in him. In addition, the testimony of the only two witnesses who testified at trial, Mr. Bunker and a Mr. Norman Frost, a Sperry director and its chief counsel, were fully believed and accepted as truthful by the court. We assume all of the foregoing findings have a basis of fact in the evidence, but we find there was additional, more germane, uncontradicted evidence, overlooked or ignored by the district court, which we are firmly convinced require us to conclude that Martin Marietta was a "director" of Sperry Rand.[2]

First and foremost is Bunkers' testimony that as chief executive of Martin Marietta he was "ultimately responsible for the total operation of the corporation" including personal approval of all the firm's financial investments, and, in particular, all of Martin's purchases of Sperry stock. As the district court aptly recognized, Bunker's control over Martin Marietta's investments, coupled with his position on the Board of Directors of Sperry Rand, placed him in a position where he could acquire inside information concerning Sperry and could utilize such data for Martin Marietta's benefit without disclosing this information to any other Martin Marietta personnel. Thus, the district court's findings that Bunker "never disclosed inside information relevant to investment decisions" and that the "information that he obtained while a director 'simply wasn't germane to that question at all'" are not significant. 286 F.Supp. at 946. Nor are these findings totally supported by the evidence. Bunker's testimony revealed that while he was a Sperry director three Sperry officials had furnished him with information relating to the "short-range outlook" at Sperry, and, in addition, Bunker admitted discussing Sperry's affairs with two officials at Martin Marietta and participating in sessions when Martin's investment in Sperry was reviewed. Moreover, an unsigned document concededly originating from the Martin Marietta files, entitled "Notes on Exploratory Investment in Sperry Rand Corporation," describing the Sperry management, evaluating their abilities, and analyzing the merit of Sperry's forecasts for the future,[3] further indicates that Martin Marietta may have benefited, or intended to benefit, from Bunker's association with Sperry Rand.

2. The procedure we follow in the review of the factual findings below is succinctly set forth in Schley v. CIR, 375 F.2d 747, 757–758 (2 Cir. 1967) (dissenting opinion):

When lower court determinations are reviewed by the appellate court, the appellate court must look first to the findings of the court below * * *; then the appellate court may examine all the evidence in the record to ascertain whether those findings are "clearly erroneous." The appellate court, to be sure, must give great weight to the inferences drawn by the trial court, but it is equally true that the appellate court may reject those inferences if they are clearly erroneous inferences and have led to a mistaken result. 2B Barron & Holtzoff, Federal Practice & Procedure, § 1133, p. 527 (1961 Wright ed.); Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123, 137 F.2d 176, 181 (5 Cir. 1943).

3. Arguably the information and opinions contained in the memorandum could have been, and might have been, formulated by someone other than a Sperry insider. Nevertheless, inasmuch as the corporation was unable to explain the source of such a relevant document so found in its possession, an inference unfavorable to Martin is the more reasonable inference.

In contrast, in Blau v. Lehman, supra, where Lehman Brothers was the alleged "director," the Lehman partner exercised no power of approval concerning the partnership's investment; was not consulted for advice; had no advance knowledge of Lehman Brothers' intention to purchase the stock of the corporation of which he was a member of the board of directors; and never discussed the operating details of that corporation's affairs with any member of Lehman Brothers. 368 U.S. at 406, 82 S.Ct. at 451. Similarly, in Rattner v. Lehman, supra, the court's decision was premised on the assumption that the defendant's purchases and sales were made without any advice or concurrence from the defendant's partner sitting on the Board of the company in whose stock the defendant traded.

It appears to us that a person in Bunker's unique position could act as a deputy for Martin Marietta even in the absence of factors indicating an intention or belief on the part of both companies that he was so acting. We do not hold that, without more, Bunker's control over Martin Marietta, see Marquette Cement Mfg. Co. v. Andreas, supra at 967, or the possibility that inside information was obtained or disclosed, mandates that Bunker was Martin's deputy. However, additional evidence detailed hereafter which indicates that the managements of Sperry Rand and of Martin Marietta intended that Bunker should act as Martin's deputy on the Sperry Board, and believed he was so acting, lends valuable support to our factual conclusion.

First, in Bunker's letter of resignation to General MacArthur, the Chairman of the Board of Directors of Sperry Rand, he stated:

When I became a member of the Board in April, it appeared to your associates that the Martin Marietta ownership of a substantial number of shares of Sperry Rand should have representation on your Board. This representation does not seem to me really necessary and I prefer not to be involved in the affairs of Sperry Rand when there are so many other demands on my time * * *.

Martin Marietta urges that we should not read this letter to mean what it so clearly says. They would have us believe that this letter was so phrased because Bunker intended "to write a gentle letter of resignation to a great (but elderly) man whom he admired, in terms that he would understand." No matter how advanced in years the Chairman of the Sperry Board may have been, we are puzzled by defendant's contention that he, and only he, of all those on the Sperry Board, considered Bunker to be representing Martin's interests. Furthermore, if, throughout Bunker's service, the Chairman of the Board misunderstood the purpose of Bunker's directorship, why Bunker upon resignation would want this misunderstanding perpetuated is even more perplexing. Certainly the more logical inference from the wording of Bunker's letter of resignation is the inference that Bunker served on the Sperry Board as a representative of Martin Marietta so as to protect Martin's investment in Sperry.

Second, the Board of Directors of Martin Marietta formally consented to and approved Bunker's directorship of Sperry prior to Bunker's acceptance of the position. While Martin's organizational policy required that Bunker secure that Board's approval of any corporate directorship he were offered, the approval was not obtained until, significantly, the Board had been informed by Bunker that Martin had a 10 million dollar investment in Sperry stock at the time. Bunker testified that he "thought the Board would draw the inference that his presence on Sperry's Board would be to Martin's interest." Indeed, as noted by the district court, "the logic behind such an inference is obvious when we stop to consider that a directorship, by its very nature, carries with it potential access to information unavailable to the ordinary investor." 286 F.Supp. at 945. Surely such conduct by the Martin Board supports an inference that it deputized

Bunker to represent its interests on Sperry's Board. The trial court's finding to the contrary leaves us with the definite and firm conviction that a mistake was indeed committed.

Finally, Bunker's testimony clearly established that the Martin Marietta Corporation had representatives or deputies who served on the boards of other corporations. The only distinctions drawn by the court below to differentiate Bunker's Sperry relationship from the relationship to Martin Marietta of other Martin Marietta deputies on other corporate boards were that Bunker had no duty to report back to Martin what was going on at Sperry and there was a lesser degree of supervision over Bunker's actions than over the actions of the others. Otherwise Bunker was a typical Martin deputy. In view of Bunker's position of almost absolute authority over Martin's affairs, such differences hardly suffice to refute the evidentiary value of the similarities between the functions of Bunker and those of Martin's representatives on other corporate boards.

■ In summary, it is our firm conviction that the district court erred in apportioning the weight to be accorded the evidence before it. The control possessed by Bunker, his letter of resignation, the approval by the Martin Board of Bunker's directorship with Sperry, and the functional similarity between Bunker's acts as a Sperry director and the acts of Martin's representatives on other boards, as opposed to the factors relied upon by the trial court, are all definite and concrete indicatives that Bunker, in fact, was a Martin deputy, and we find that indeed he was.

■ The trial court's disposition of the case obviated the need for it to determine whether § 16(b) liability could attach to the corporate director's short-swing profits realized after the corporation's deputy had ceased to be a member of the board of directors of the corporation whose stock had been so profitably traded in. It was not until after Bunker's resignation from the Sperry Board had become effective that Martin Marietta sold any Sperry stock. The issue is novel and until this case no court has ever considered the question. We hold that the congressional purpose dictates that Martin must disgorge all short-swing profits made from Sperry stock purchased during its Sperry directorship and sold after the termination thereof if sold within six months of purchase.

Relying upon the congressional objectives sought to be accomplished by the passage of § 16(b), this court, in Adler v. Klawans, 267 F.2d 840 (2 Cir. 1959), held that § 16(b) imposes liability to surrender his short-swing profits upon a person who is a director at the date of sale, whether or not he was a director at the date of purchase. The court explained:

This [the language of § 16(b) itself] makes plain the intent of Congress to reach a "purchase and sale" or "sale and purchase" within a six month period by someone within one of the proscribed categories, i. e., one who was a director, officer or beneficial owner *at some time*. The conventional rules of construction applied to this latter portion of the statute alone are not sufficient to resolve the issue. Appellant presents an arguable interpretation of the statute which would limit its reach to transactions in which the person is a director or officer at both ends of the transaction. If Congress had made such profits the subject of a criminal penalty—as presumably it could—appellant's argument would carry much weight for we would be obliged to construe it strictly. For reasons which will be developed more fully hereafter we construe this statute to be remedial, not penal, and hence subject to that interpretation most consistent with the legislative purpose as that can be discerned from the statute itself and by resort to its history if that be needed. 267 F.2d at 844.

It must be emphasized, of course, that the statute evidences a clear legislative intent to treat corporate directors and

officers in one category of insiders and 10% shareholders in another. The act expressly sets forth that the liability of a 10% shareholder to surrender his short-swing profits is conditional upon his being such both at the time of purchase and at the time of sale,[4] but there is no such limitation in the case of officers and directors. 267 F.2d at 845; Blau v. Allen, 163 F.Supp. 702, 704 (SDNY 1958). See also 2 Loss, Securities Regulation 1060 (2d ed. 1961).

Our decision in *Adler*, however, did not require us to consider the validity of Rule X–16A–10 of the Securities Exchange Commission, 17 C.F.R. § 240.16a–10, which reads:

> Any transaction which has been or shall be exempted by the Commission from the requirements of section 16 (a) shall, in so far as it is otherwise subject to the provisions of section 16(b), be likewise exempted from section 16(b).

Section 16(a) of the Act provided, in 1963:

> Every person who is directly or indirectly the beneficial owner of more than 10 per centum of any class of any equity security (other than an exempted security) which is registered on a national securities exchange, or *who is a director* or an officer of the issuer of such security, shall file, at the time of the registration of such security or within ten days *after he becomes such beneficial owner, director, or officer,* a statement with the exchange (and a duplicate original thereof with the Commission) of the amount of all equity securities of such issuer of which he is the beneficial owner, and within ten days after the close of each calendar month thereafter, if there has been any change in such ownership during such month, shall file with the exchange a statement (and a duplicate original thereof

with the Commission) indicating his ownership at the close of the calendar month and such changes in his ownership as have occurred during such calendar month. 15 U.S.C. § 78p(a) (1964). (Emphasis supplied.)

On the form provided by the SEC for a director to file his statement of changes in stock ownership, the Commission further clarifies a director's obligation to report under § 16(a), as follows:

> Form 4
>
> 1. Persons Required to File Statements.
>
> Statements on this form are required to be filed by each of the following persons:
>
> (a) Every person who at any time during any calendar month was (i) directly or indirectly the beneficial owner of more than 10 percent of any class of equity securities (other than exempt securities) listed and registered on a national securities exchange, or (ii) a director or officer of the company which is the issuer of such securities, and who during such month had any change in his beneficial ownership of any class of equity securities of such company * * *.

In *Adler*, this court read this last rule to require a director to report all "changes in his ownership" irrespective of whether the ownership was established "by a director while a director." 267 F.2d at 847. Indeed, § 16(a) itself expressly imposes its requirements on every person "who is a director" or who "becomes such * * * director." Thus, by finding that § 16(a)'s reporting rules extend to a director who became such after the acquisition of securities, we were able to avoid deciding whether Rule X–16A–10 constituted a proper exercise of the Commission's power.

Congress has vested the Commission with broad power to promulgate rules

---

4. " * * * This subsection shall not be construed to cover any transaction where such beneficial owner was not such both at the time of purchase and sale, or the sale and purchase, of the security involved, or any transaction or transactions which the Commission by rules and regulations may exempt as not comprehended within the purposes of this subsection." (Final sentence of § 16(b).)

and regulations exempting transactions from the coverage of § 16(b). But, as this court has commented on a previous occasion, the promulgation of rules is not a matter solely within the expertise of the SEC and beyond the scope of judicial review. Greene v. Dietz, 247 F.2d 689, 692–693 (2 Cir. 1957). See also Perlman v. Timberlake, 172 F.Supp. 246, 254–255 (SDNY 1959). The Commission's authority, according to the statute, is subject to the limitation that the transactions the SEC exempts are "not comprehended within the purpose" of § 16(b).[5] We must determine, therefore, whether the Commission by exempting from § 16(b) liability any transaction not required to be reported under § 16(a) exceeded the authority delegated to it by Congress.

To be sure, the congressional belief that inside information could be abused, the belief that prompted the prophylactic enactment of § 16(b), is just as germane to the situation when a person is a director only at the time of purchase as when he is a director only at the time of sale. For, in the case of a director who resigns his directorship before the sale it is possible for both the purchase and sale to have been unfairly motivated by insider knowledge; whereas if the purchase were made prior to the directorship only the sale could be motivated by inside information. Clearly, therefore, a "short swing" sale or purchase by a resigning director must be a transaction "comprehended within the purpose of" § 16(b), and to the extent Rule X–16A–10 exempts such a transaction from § 16(b) the Rule is invalid.

Martin Marietta Corporation has urged, in opposition to this approach, that in the *Adler* case this court, in dictum, approved of Rule X–16A–10 when we said:

We agree that, if he is exempt from the Section 16(a) reporting require-ment, he would be exempt under Rule X–16A–10 from the accounting requirements of Section 16(b). 267 F.2d at 847.

However, the quoted statement was made in an opinion holding that liability under § 16(b) was established. Similarly, the contexts in which other courts have said that § 16(b) must be read in conjunction with § 16(a) in order to determine § 16(b) liability have all also involved an affirmative, rather than a negative, finding of § 16(b) liability. Pappas v. Moss, 257 F.Supp. 345, 366 (D.N.J.1966); Heli-Coil Corp. v. Webster, 222 F.Supp. 831, 836 (D.N.J.1963), modified on other grounds, 352 F.2d 156 (3 Cir. 1965).

Arguably, however, § 16(b) itself, as well as, arguably, the SEC regulations, limits liability to only those persons encompassed within the meaning of subsection (a), for subsection (b) applies to "such beneficial owner, director, or officer," and, when literally read, this language probably means only such beneficial owner, director, or officer as described in subsection (a).[6] So semanticizing, it would follow that if a person has no duty to report pursuant to § 16(a) he ought not to be required to relinquish his short-swing profits under § 16(b). SEC Form 4, however, which governs the reporting provision of § 16(a) seems to extend the reporting requirement to ex-directors so as to include the calendar month during which their directorships terminate. Consequently, even if we found Rule X–16A–10 to be a valid Rule, there is no difficulty in finding that liability under § 16(b) can attach to ex-directors for transactions executed within the calendar month of their resignations. Unlike Rule X–16A–10, Form 4 is entirely consistent with and in furtherance of the legislative purpose of § 16.

While Form 4 represents a proper exercise by the Commission of its rule-making power it is arbitrarily inade-

---

5. See footnote 4, supra.

6. Though the construction set forth in the text would seem to be the correct one,

it is possible that the "such" modifies only "beneficial owner."

quate. For example, it would permit a director of a corporation to purchase its stock within six months prior to a September 3, during his directorship, resign on August 31, sell the stock on September 2, and not have any obligation to report the sales transaction, but if he had resigned on September 1 he would have had a duty to report the September 2 transaction. Such an arbitrary rule provides an unnecessary loophole in the effective operation of the statutory scheme. While we do not here determine the effect of Form 4 on the scope of § 16(a), we do point out that the Form 4 reporting requirement here mentioned extends § 16(b) putative liability to the extent of that requirement. Therefore, inasmuch as Form 4, a valid exercise of the SEC's power, has already extended § 16(b) to cover, in part, an ex-director's activities, a less arbitrarily defined reporting requirement for ex-directors is but a logical extension of § 16(b) coverage, would be a coverage in line with the congressional aims, and would afford greater assurance that the lawmakers' intent will be effectuated. In view of the foregoing, we hold that § 16(b) applies to a sale of corporate stock by a former director of that corporation if the stock were purchased by him (or purchased by any jural person that had "deputized" him) during the time he was a director and the sale was made within six months after purchase.

Under the well-established rule, profits for § 16(b) purposes are computed by arbitrarily matching purchases with sales in order to obtain the maximum amount of profits. Gratz v. Claughton, 187 F.2d 46 (2 Cir. 1951); Smolowe v. Delendo Corporation, 136 F.2d 231 (2 Cir.), cert. denied, 320 U.S. 751, 64 S.Ct. 56, 88 L.Ed. 446 (1943). As the briefs do not agree as to the exact amount of the profits Martin Marietta made and do not give us all the relevant data for us to make a correct determination, and as, additionally, the trial court has discretion in connection with an award of interest in a § 16(b) suit, we remand the case to the district court with instructions to proceed with these determinations.

Reversed and remanded.